**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document was signed electronically on August 27, 2021, which may be different from its entry on the record.**

**IT IS SO ORDERED.**

**Dated: August 27, 2021**



ARTHUR I. HARRIS
UNITED STATES BANKRUPTCY JUDGE

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| BRAD H. FRIEDLANDER, | ) | Case No. 19-12300 |
| Debtor. | ) | |
| | ) | Judge Arthur I. Harris |
| | ) | |
| | ) | |
| KAPITUS SERVICING, INC. f/k/a/ | ) | Adversary Proceeding |
| COLONIAL FUNDING | ) | No. 19-1070 |
| NETWORK, INC. AS SERVICER | ) | |
| FOR ADVANCE AMERICAN | ) | |
| BUSINESS SOLUTIONS, LLC, | ) | |
| Plaintiff. | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRAD H. FRIEDLANDER, | ) | |
| Defendant. | ) | |

# MEMORANDUM OF OPINION[1]

In this adversary proceeding, plaintiff-creditor Kapitus Servicing, Inc. f/k/a Colonial Funding Network, Inc. ("Kapitus") seeks a determination that a debt owed by the defendant-debtor Brad H. Friedlander is nondischargeable under various subdivisions of 11 U.S.C. § 523(a).  In general, Kapitus asserts that the debtor made various misrepresentations to induce Kapitus to enter into a merchant funding agreement (the "Agreement") with BJRP, LLC d/b/a/ Moxie Restaurant ("BJRP"), for which the debtor was an owner/officer/director/member/manager and guarantor.  On June 3, 2021, the Court conducted a trial on Kapitus's nondischargeability claims.  For the reasons that follow, the Court finds that Kapitus has failed to establish by a preponderance of the evidence the elements for nondischargeability under any of its claims for relief.  The Court therefore enters judgment in favor of the debtor.

## JURISDICTION

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  The Court has jurisdiction over core proceedings under 28 U.S.C. §§1334 and 157(a) and Local General Order 2012-7 of the United States District Court for the Northern District of Ohio.  Both Kapitus and the debtor have expressly consented to the bankruptcy

---

[1] This Opinion is not intended for official publication.

2

court entering a final judgment (Adv. No. 19-1070, Docket Nos. 1, 4). *See*

*Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, 686 (2015) ("Article III

permits bankruptcy courts to decide *Stern* claims submitted to them by consent.").

## PROCEDURAL HISTORY

On April 17, 2019, the debtor filed a voluntary petition under Chapter 7 of

the Bankruptcy Code (Case No. 19-12300, Docket No. 1). On July 18, 2019,

Kapitus filed this adversary proceeding seeking a determination that a debt owed to

Kapitus is nondischargeable under various subdivisions of § 523(a) of the

Bankruptcy Code (Adv. No. 19-1070, Docket No. 1). In Count One, Kapitus

asserts that the debt is nondischargeable under § 523(a)(2)(A) for false

misrepresentations, false pretenses, and actual fraud. In Count Two, Kapitus

asserts that the debt is nondischargeable under § 523(a)(2)(B) for intentional,

materially false statements made in writing. In Count Three, Kapitus asserts that

the debt is nondischargeable under § 523(a)(4) for fraud or defalcation while the

debtor was acting in a fiduciary capacity and for embezzlement. In Count Four,

Kapitus asserts that the debt is nondischargeable under § 523(a)(6) for willful and

malicious injury. On August 19, 2019, the debtor filed an answer (Docket No. 4).

On March 19, 2020, Kapitus moved for summary judgment and filed a

brief in support (Docket Nos. 17, 18). On May 21, 2020, the debtor filed a

3

response arguing that there were numerous issues of material fact with regard to each count (Docket No. 26).  On June 25, 2020, the Court denied Kapitus's motion for summary judgment (Docket No. 32).  The Court held that genuine issues of material fact remained as to all four counts alleged by Kapitus.

On June 3, 2021, the Court conducted a trial on Kapitus's claims of nondischargeability.  The Court heard testimony from three witnesses as part of Kapitus's case-in-chief—Kapitus employees Jason Bishop and David Wolfson and the former acting chief financial officer of BJRP Jonathan Gross.  The debtor rested his case-in-chief without calling any witnesses.  The Court received Kapitus's exhibits 1–23 and debtor's exhibits A–F without objection, subject to further redaction of Kapitus's Exhibit 6.  At the parties' request and in lieu of closing arguments, post-trial briefs were filed on July 16, 2021, and July 19, 2021.

This memorandum constitutes the court's findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## FINDINGS OF FACT

The findings of fact contained in this memorandum of opinion reflect the Court's weighing of the evidence, including the credibility of each witness.  In doing so, "the court considered the witnesses' demeanor, the substance of the testimony, and the context in which the statements were made, recognizing that a

4

transcript does not convey tone, attitude, body language or nuance of expression."
*In re Parrish*, 326 B.R. 708, 711 (Bankr. N.D. Ohio 2005). Even if not specifically mentioned in this decision, the Court considered the testimony of the trial witnesses and the exhibits admitted into evidence. Unless otherwise indicated, the following facts were established at trial by a preponderance of the evidence or were stipulated to by the parties.

*Stipulations*

The parties submitted the following joint stipulation of facts (Docket No. 49):

1. Plaintiff is a Virginia corporation with a principal office located at 2500 Wilson Blvd., Suite 350, Arlington, VA 22201.

2. Debtor/Defendant is an individual residing at 20 Oakshore Drive, Cleveland, OH 44108.

3. BJRP LLC d/b/a Moxie Restaurant. ("BJRP") is a company duly organized in the State of Ohio.

4. The Defendant is or was, at all relevant times, an owner/officer/director/member/manager and guarantor of BJRP.

5

5. BJRP filed Chapter 11 on September 28, 2018 in the United States District Court for the Northern District of Ohio at Case No. 18-15839 ("BJRP Case").

6. Plaintiff is an unsecured creditor with a claim against Defendant pursuant to a certain personal guaranty of an obligation executed by Defendant and as more fully detailed below.

7. Defendant filed his personal Chapter 7 bankruptcy on April 17, 2019 in the United States District Court for the Northern District of Ohio at Case No. 19-12300 ("Bankruptcy Case").

8. In the Bankruptcy Case, Plaintiff filed its proof of claim at Claim No. 17 in the amount of $464,481.70 on August 5, 2019 ("Claim").

9. Defendant listed Plaintiff and its Claim as undisputed on his Schedule E/F filed on April 17, 2019 at Doc. No. 1 in the Bankruptcy Case.

10. July 19, 2019 was established as the deadline to object to discharge.

11. Plaintiff filed its Complaint for Non-Dischargeability on July 18, 2019 at Adversary Case No. 19-01070 ("Adversary Case").

12. Defendant made representations to Plaintiff through a funding call on May 8, 2018 ("Funding Call").

6

13. The parties stipulate to the contents and admissibility of the transcript of the Funding Call.

14. On May 7, 2018, Defendant provided the OnDeck payoff agreement and executed a payment authorization form.

15. On May 7, 2018, Defendant, as both a principal and guarantor, executed a Revenue Based Factoring (RBF/ACH) Agreement (hereinafter "Agreement") with Plaintiff.

16. The parties hereby agree to the admissibility of the Agreement.

17. In the Agreement, the Defendant sold and Plaintiff purchased Merchant's (as defined in the Agreement) receivables in the amount of Five Hundred Seventy Eight Thousand, One Hundred Dollars ($578,100.00) (the "Purchased Receivables") in exchange for an up-front advance in the amount of Four Hundred Ten Thousand Dollars ($410,000.00)(the "Purchase Price" or "Funds").

18. Pursuant to the Agreement, Merchant agreed to deposit all of its receipts in one (1) bank account acceptable to Plaintiff (the "Agreed Account") and irrevocably authorized Plaintiff to debit the Purchased Receivables from the Agreed Account via ACH (Automatic Clearing House) payments in the

7

weekly amount of Seven Thousand, Four Hundred Eighteen Dollars ($7,418.00).

19.  The parties agree to the contents and admissibility of the Agreement.

20.  On or about May 8, 2018, Plaintiff fulfilled its obligations under the Agreement by advancing the Purchase Price to BJRP less any fees owed.

21.  On May 9, 2018, Plaintiff filed a UCC-1 financing statement (the "Financing Statement") with the Ohio Secretary of State, thereby perfecting its purchase of the Purchased Receivables.

22.  Under the terms of the Agreement, Kapitus Servicing, Inc. f/k/a Colonial Funding Network, Inc. is designated as Advance American Business Solutions, LLC, general agent to service and enforce the Agreement; including enforcement through legal action.

23.  The Agreement terms provided specific weekly payments of $7,418.00 by ACH.

24.  The Agreement referenced entities located at the following addresses: (1) 3355 Richmond Rd. Suite 150 Beachwood, OH 44122; (2) 119 Washington Avenue, Miami Beach, FL 33139; (3) 417 Prospect Avenue E, Cleveland, OH 44115; (4) 14 W. Maryland St, Indianapolis, IN 46204; and (5) 600 Grant Street, Pittsburgh, PA 15219.

8

25. On May 8, 2018, Plaintiff issued a payoff check to OnDeck Capital in the amount of $180,716.21 as a condition of the Agreement.

26. From May 21, 2018 through October 1, 2018, Plaintiff deducted $7,418.00 weekly payments per the Agreement, except that during the period July 30, 2018 through August 20, 2018, the agreed weekly deductions were reduced to $3,000.00.

27. The last payment made by BJRP or Defendant was in the amount of $7,418.00 on October 1, 2018, which was reversed on October 3, 2018, as a result of the filing of the BJRP Case.

28. Of the $578,100.00 of Purchased Receivables, Plaintiff has received $130,688.00 (22.6% of the total Purchased Receivables), leaving a balance of $447,412.00 outstanding under the Agreement.

29. Contemporaneous with the execution of the Agreement, Debtor also executed a Personal Guaranty whereby he personally guaranteed the full and prompt performance of all obligations under the Agreement.

30. Contemporaneous with the execution of the Agreement, Defendant and BJRP executed a Security Agreement.

9

31.  At all times relevant hereto, the Defendant was BJRP's owner, controlled BJRP, and made all decisions and statements to Plaintiff relevant to the issues herein.

*See* Docket No. 49.

The parties agreed that the Court may take judicial notice of the following:

- The Chapter 7 Petition and Schedules in Case No. 19-12300 (Case No. 19-12300, Docket No. 1).

- The debtor's amended schedules (Docket No. 15).

- BJRP's Chapter 11 Petition and Schedules in Case No. 18-15839.

*Id*.

## ADDITIONAL FINDINGS OF FACT

### *Witness Testimony*

At trial, Jason Bishop testified generally about Kapitus's due diligence process, the funding call, and independent sales organizations.  Mr. Bishop explained that independent sales organizations identify businesses that could use working capital and then submit the files to Kapitus.  Kapitus then has an underwriter conduct background checks, credit reports, and bank statement analyses to build a risk model.  Later, Kapitus conducts a merchant interview and asks general business questions.  Finally, Kapitus performs a funding call which

10

Mr. Bishop described as "a recorded call that goes over the [basic] representations and warranties by the business regarding the contract and what the contract states." *See* Trial Tr. 21–22. Kapitus played the funding call at trial. Before the debtor made any representations regarding BJRP, a representative of Kapitus stated that "[y]ou have been approved for a total funding of $410,000." *See* Trial Tr. 28. Kapitus also called David Wolfson, a collections expert for Kapitus, who became involved when BJRP applied for the loan modification. Finally, the Court heard testimony from Jonathan Gross, who did not carry an official title of chief financial officer of BJRP but did act in that capacity. Mr. Gross testified to BJRP's cash flow problems during the summer of 2018 due to construction work around one of the restaurants. He explained that he applied for the payment modification that Kapitus ultimately approved in the amount of $3,000 for a four-week period. BJRP resumed paying $7,418 on August 27, 2021, until filing for bankruptcy on September 28, 2018.

*BJRP Bankruptcy*

On June 18, 2018, Tower IV LLC purchased the loan that BJRP owed to Peoples Bank. *See* (Case No. 18-15839, Docket No. 47). On September 28, 2018, BJRP filed a Chapter 11 bankruptcy petition (Case No. 18-15839, Docket No. 1). On October 5, 2018, Tower IV LLC made an additional postpetition advance of

11

$80,000 pursuant to the Court's interim order (Case No. 18-15839, Docket No. 19). On December 26, 2018, the Court issued an order authorizing and approving the debtor's entry into an asset purchase agreement with Tower IV LLC (Case No. 18-15839, Docket No. 55). According to the sale motion (Case No. 18-15839, Docket No. 47), Tower IV LLC had a first and best lien and was owed approximately $984,000. Tower IV LLC made a credit bid of $750,000 and agreed to cover the costs associated with curing the lease and other costs related to the sale. Kapitus did not receive any money for its secured claim. Nor did Kapitus come forward with a higher offer than Tower IV LLC's $750,000 credit bid. The Chapter 11 case remains pending with no cash or apparent assets.

<em>Friedlander Bankruptcy</em>

On April 17, 2019, the debtor filed a Chapter 7 bankruptcy case (Case No. 19-12300, Docket No. 1) and received a discharge on July 24, 2019. The trustee's final report (Case No. 19-12300, Docket No. 39) indicates that about $25,000 was distributed with approximately $3,300 going to pay Chapter 7 administrative expenses and the remaining balance of approximately $22,000 to pay priority tax claims. General unsecured creditors, including Kapitus, received nothing. As noted in the stipulations, the debtor does not dispute the $464,481.70 listed by Kapitus in its proof of claim.

12

CONCLUSIONS OF LAW

Kapitus maintains that the stipulations and evidence at trial establish the elements for nondischargeability on each of its four claims for relief under § 523— § 523(a)(2)(A), (a)(2)(b), (a)(4), and (a)(6). Kapitus has the burden of proving by a preponderance of the evidence each of the elements required for nondischargeability. *See Grogan v. Garner*, 498 U.S. 279 (1991). The Court will address each of the four claims in order.

*Count One—Nondischargeability under 11 U.S.C. § 523(a)(2)(A)*

In Count One, Kapitus alleges that the debt is nondischargeable under § 523(a)(2)(A) for funds obtained through false pretenses, false representation, or actual fraud.

Section 523 provides in pertinent part:

> (a) A discharge under section 727. . . of this title does not discharge an individual debtor from any debt—
> . . . .
> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . . .

11 U.S.C. § 523(a)(2)(A). To except a debt from discharge under § 523(a)(2)(A), a creditor must prove: (1) the debtor obtained money through a material

13

misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss. *See Rembert v. AT&T Universal Card Servs.* (*In re Rembert*), 141 F.3d 277, 280–81 (6th Cir. 1998). The creditor must demonstrate justifiable reliance under this section and need not pass the higher standard of reasonable reliance. *Field v. Mans*, 516 U.S. 59, 74–75 (1995).

Section 523(a)(2)(A) expressly excludes all statements respecting a debtor's financial condition, whether written or oral, as a basis for nondischargeability. *Prim Capital Corp. v. May* (*In re May*), 368 B.R. 85, 2007 WL 2052185, at *5 (B.A.P. 6th Cir. 2007). Instead, statements respecting a debtor's financial condition fall under § 523(a)(2)(B). A debt based upon an oral misrepresentation of financial condition is not actionable and will be dischargeable. *Id*. The United States Supreme Court has held that the term "statement . . . respecting the debtor's . . . financial condition" should be interpreted very broadly, encompassing even a statement about a single asset. *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S. Ct. 1752, 1764 (2018). Justice Sotomayor explained that creditors still benefit from the protection of § 523(a)(2)(B) so long as they insist that the representations respecting the debtor's financial condition on which they rely in

14

extending money, property, services, or credit are made in writing. *Id*.

A debt may also be excepted for discharge under § 523(a)(2)(A) for "actual fraud." In *Husky Intern. Electronics, Inc. v. Ritz*, 136 S. Ct. 1581, 1590 (2016), the Supreme Court held that the term "actual fraud" in § 523(a)(2)(A) includes fraudulent schemes even when those schemes do not involve a false representation, such as a fraudulent conveyance of property made to evade payment to creditors.

In Count One, Kapitus alleges that the debt owed Kapitus under the debtor's personal guarantee is nondischargeable under § 523(a)(2)(A) for funds obtained through false pretenses, false representation, and actual fraud.

Kapitus asserts that the debtor misrepresented the intended use of proceeds advanced to BJRP because BJRP did not use the funds for "working capital" and instead used the funds to pay existing obligations. The debtor argues that the Agreement did not restrict the use of proceeds to strictly working capital and did not define use of proceeds. *See* Trial Tr. 77–78. Kapitus provided two merchant funding applications. The first, dated May 1, 2018, contains a section where the debtor indicated that the use of proceeds would be to "refinance." *See* Pl. Ex. No. 2. The second, dated May 3, 2018, does not contain a section for the debtor to indicate use of proceeds and ultimately was the application that served as the basis

15

for the Agreement.  *See* Pl. Ex. No. 1.  The debtor admits that it paid off an existing obligation to OnDeck as a condition of the Agreement.  Joint Stip. No. 25.

At trial, Kapitus played a funding call between the debtor and a representative of Kapitus to further support its argument that the debtor misrepresented BJRP's intended use of proceeds.  It is unclear whether the debtor intended to deceive Kapitus when making these representations.  It is also unclear whether Kapitus relied on the representations that the debtor made during the funding call.  Kapitus's representative states on the call that "[y]ou have been approved for a total funding of $410,000" before the debtor made any representations regarding BJRP.  *See* Trial Tr. 28.  This statement by a representative of Kapitus suggests that Kapitus's funding calls are intended to make a record for future litigation rather than to help Kapitus decide whether to lend money to a potential borrower.

Kapitus also argues that the debtor violated Section 2.10 of the Agreement, which prohibits additional financing agreements without Kapitus's consent, and that by signing the Agreement and seeking additional financing for BJRP, the debt should be nondischargeable.

Section 2.10 states:

**2.10 Additional Financing.** Merchant shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form

16

of a purchase of receivables or a loan to the business with any party other than FUNDER without their written permission.

*See* Pl. Ex. No. 7, Section 2.10.  Jonathon Gross admitted at trial that during the summer of 2018 the debtor was looking for additional funds for BJRP, but that those efforts ultimately failed.  *See* Trial Tr. 124–25.  The parties do not dispute that Section 2.10 prohibits BJRP from obtaining additional financing without Kapitus's written permission.  However, the agreement is silent on whether the debtor or BJRP may even seek additional financing.  Nevertheless, even if seeking additional financing violated the Agreement, Kapitus does not establish that the debtor's act of seeking additional financing was done with an intent to deceive.  If anything, the debtor's actions are evidence that he intended to keep the business afloat and ultimately repay Kapitus.  *See* Trial Tr. 124–25.

However,  Kapitus points to BJRP's Chapter 11 Schedule D in its post-trial brief to show that BJRP received additional financing from Tower IV LLC on June 1, 2018.  *See* Pl. Post-Trial Brief at 17, *see also* Pl. Ex. No. 21.  At trial, Kapitus did not question witnesses about additional funding from Tower IV LLC or reference Tower IV LLC in any way.  Exhibit 14 contains the only reference to Tower IV LLC.  When questioned about Jonathan Gross' request for a payoff letter, Mr. Wolfson indicated that it was a printout of Kapitus's notes database.  *See* Trial Tr. 102.  Exhibit 14 shows that when Jonathan Gross inquired about a

17

payoff letter, Nichole Callaway, a representative of Kapitus, indicated that she was aware of additional financing from Tower IV LLC. *See* Pl. Ex. No 14, *see also* Def. Ex. E. Notwithstanding BJRP's potential violation of the Agreement, Kapitus chose to enter the modification agreement and reduce weekly payments to $3,000. By itself, receiving additional financing in violation of the Agreement without the debtor's intent to deceive Kapitus is not enough to render the debt nondischargeable.

Kapitus also asserts that the debtor purposely omitted BJRP's ownership structure and represented that he was the sole owner. Even if the debtor purposefully omitted this information to deceive Kapitus, Kapitus had information which made it aware of BJRP's ownership structure prior to execution of the Agreement. Form 1065, which the debtor provided prior to funding, identifies two additional partners other than the debtor. *See* Pl. Ex. No. 5. Mr. Bishop also testified that this information was available prior to funding. *See* Trial Tr. 60. Furthermore, Mr. Bishop kept notes of his conversation with the debtor, dated May 8, 2018, which reflect his knowledge that Peter Vauthy was a 30% co-owner of BJRP. *See* Pl. Ex. No. 4.

The Court need not decide whether Kapitus has established the first, third, and fourth elements for nondischargeability under § 523(a)(2)(A) as stated in

18

*Rembert*. This is because the Court finds that Kapitus has failed to establish the second element by a preponderance of the evidence, namely, that the debtor intended to deceive Kapitus when he made any of the allegedly false statements. Although the Court has no way of knowing for certain the debtor's state of mind, the circumstantial evidence is consistent with the debtor doing everything he could to keep the restaurant operations going during a difficult period. This includes providing Kapitus with whatever information it requested: including bank statements, tax returns, and other information about BJRP and affiliated companies. These records were like an open book into the restaurant's financial situation, identifying BJRP's other lenders as well as transfers back and forth among related entities. Given the debtor's personal guaranty of the debt BJRP owed to Kapitus, the debtor also had no incentive to have BJRP borrow money from Kapitus with no intention of paying it back. Plus, the record establishes that BJRP made regular weekly payments. Thus, the Court need not decide whether Kapitus has established the other elements of nondischargeability for false pretenses or false representation under *Rembert*.

Nor does the Court ascribe any special significance to the fact that BJRP was ultimately unable to make all the payments required under the Agreement, especially given the large finance costs associated with BJRP's debt to Kapitus. In

19

exchange for borrowing $410,000, BJRP agreed to pay back a total of $570,000 over 18 months. In fact, BJRP netted only about $400,000 after paying approximately $10,000 in costs and fees up front. *See* Pl. Ex. No. 6. Businesses seeking this form of alternative financing presumably only do so if other, less expensive financing options are unavailable. It is logical to infer that a higher percentage of such loans are likely to end up in default than with traditional loans, if only because of the increased risk and heavier debt load associated with such loans.

For similar reasons, the Court finds that Kapitus has also failed to establish "actual fraud" under section 523(a)(2)(A) and the Supreme Court's decision in *Husky*. In *Husky*, the debtor Ritz did not guarantee and was not personally liable for the debt that the corporation he controlled—Chrysalis—owed to the creditor Husky. Ritz then fraudulently transferred money away from Chrysalis. In the current case, however, the debtor personally guaranteed the debt that BJRP owed to Kapitus. That put the debtor on the hook for any money that BJRP was unable to pay back to Kapitus. Yes, the debtor and BJRP were desperately seeking ways to refinance, bring in new investors, or otherwise keep the restaurant business afloat during a difficult time. But the Court sees no evidence that the debtor's actions were part of a scheme to intentionally defraud Kapitus.

20

Accordingly, Kapitus has failed to prove by a preponderance of the evidence

that the debt owed by the debtor to Kapitus is nondischargeable under

§ 523(a)(2)(A).

*Count Two—Nondischargeability under 11 U.S.C. § 523(a)(2)(B)*

Section 523 provides in pertinent part:

(a) A discharge under section 727. . . of this title does not discharge an
individual debtor from any debt—
> . . . .
> (2) for money, property, services, or an extension, renewal, or
> refinancing of credit, to the extent obtained by—
>> . . . .
>> (B) use of a statement in writing—
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial
>>> condition;
>>> (iii) on which the creditor to whom the debtor is
>>> liable for such money, property, services,
>>> or credit reasonably relied; and
>>> (iv) that the debtor caused to be made or published
>>> with intent to deceive. . . .

11 U.S.C. § 523(a)(2)(B). To except a debt from discharge under § 523(a)(2)(B), a

creditor has the burden of proving each of these elements by a preponderance of

the evidence. *See FirstMeritBank, N.A. v. Green* (*In re Green*), 240 B.R. 889, 891

(Bankr. N.D. Ohio 1999) (citing *Grogan*, 498 U.S. 279). The United States

Supreme Court has interpreted the second element—a statement respecting the

debtor's financial condition—very broadly, encompassing even a statement about a

21

single asset. *Lamar, Archer & Cofrin*, 138 S. Ct. at 1764. Section 523(a)(2)(B) applies not only to the debtor himself but also to an "insider." Section 101(31)(A)(iv) of the Bankruptcy Code defines the term "insider" to include a "corporation of which the debtor is a director, officer, or person in control . . . ." Section 523(a)(2)(B) therefore encompasses any false statements in writing respecting BJRP's financial condition.

The Court's memorandum of opinion dated June 25, 2020, identifies sections of the Agreement that constitute written statements regarding BJRP's financial condition—including Sections 2.1, 2.9, and 2.11. *See* Memorandum, of Opinion at Docket No. 32.

The Agreement states in pertinent part:
        . . . .

**2.1 Financial Condition and Financial Information.** Its bank and financial statements, copies of which have been furnished to FUNDER, and future statements which will be furnished hereafter at the discretion of FUNDER, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise FUNDER of any material change in its financial condition, operation or ownership. Funder may request statements at any time during the performance of this Agreement and the Merchant shall provide them to FUNDER within 5 business days. Merchant's failure to do so is a material breach of this Agreement.
        . . . .

**2.9 No Bankruptcy or Insolvency.** As of the date of this Agreement,

22

Merchant represents that it is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. . . .

. . . .

**2.11 Unencumbered Receipts.** Merchant has good, complete and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of FUNDER.

. . . .

*See* Pl. Ex. No. 7—Sections 2.1, 2.9, and 2.11.

Kapitus argues that the debtor's omission of the fact that BJRP possessed existing merchant funding in its application constitutes a materially false statement in writing rendering the debt nondischargeable under § 523(a)(2)(B). Both applications submitted to Kapitus are written statements within the meaning of § 523(a)(2)(B). Furthermore, it is not disputed that BJRP had existing merchant funding when it submitted both applications, and that neither application disclosed this fact. However, Kapitus cannot show it reasonably relied on BJRP's omissions. Prior to ultimately funding the Agreement, Kapitus rejected the first application submitted by BJRP on May 1, 2018, because it was aware of existing funding from another source. Mr. Bishop testified that Kapitus rejected the first application for

23

"high competitor balance" which occurs when Kapitus detects potential cash flow problems related to alternative funding like the kind Kapitus provides. *See* Trial Tr. 24–25.

Kapitus argues that the debtor misrepresented BJRP's intentions under Section 2.1 and Section 2.9 of the Agreement. Kapitus alleges that BJRP's request for payment reductions in a merchant modification application dated July 23, 2018, and consultation with bankruptcy counsel show that BJRP misrepresented its financial condition to Kapitus causing it to enter into the Agreement. First, there is no evidence that the bank statements and other documents that BJRP provided to Kapitus were false or provided with an intent to deceive. Nor is there evidence that BJRP was insolvent at the time the parties executed the Agreement. Kapitus's argument that BJRP and the debtor intended to file for bankruptcy when applying for funding is also without merit. In fact, BJRP made the full $7,418 weekly payment from May 21, 2018, to July 23, 2018. *See* Pl. Ex. No. 10. On July 23, 2018, BJRP submitted a merchant modification application to reduce the weekly payment amount to $3,000 for the following six weeks. *See* Pl. Ex. No. 9. The stated reason in the application was: "Slow down at Business due to large construction projects in the area. Facing cash flow shortages." *Id*. The payment was reduced for the following four weeks, and on August 27, 2018, BJRP resumed

24

paying the full $7,418 amount until filing for bankruptcy on September 28, 2018. *See* Pl. Ex. No. 10. While this application is evidence that BJRP was experiencing cash flow problems during the summer of 2018, it is not evidence of an effort by BJRP or the debtor to deceive Kapitus and ultimately file for bankruptcy. The merchant modification application does not support Kapitus's argument that BJRP and the debtor misrepresented the financial condition of BJRP to induce Kapitus to extend funding. Nor does meeting with bankruptcy counsel during a period of a cash flow shortage indicate that the debtor's original intent was to deceive Kapitus.

Kapitus argues that the debt is nondischargeable under § 523(a)(2)(B) because Section 2.11 states that the daily receipts of BJRP were unencumbered and that the debtor attested to this when this was not the case. While this would constitute a materially false statement in writing, Kapitus cannot show by a preponderance of the evidence that its reliance was reasonable. At trial, Mr. Bishop testified that Kapitus conducted a lien search as part of Kapitus's due diligence process. *See* Trial Tr. 80. The lien search document—dated May 2, 2018—shows that BJRP had other secured creditors with perfected liens prior to execution of the Agreement. *See* Def. Ex. C. Therefore, because Kapitus was in possession of information prior to execution of the Agreement that highlights the falsity of the debtor's statement, Kapitus cannot show it reasonably relied. *See*

25

*BancBoston Mortg. Corp. v. Ledford* (*In re Ledford*), 970 F.2d 1556, 1560 (6th Cir. 1992) ("Among the circumstances that might affect the reasonableness of a creditor's reliance are: . . . (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.").

Regardless of whether Kapitus has established the other elements for nondischargeability under § 523(a)(2)(B), Kapitus has failed to establish by a preponderance of the evidence that any written statement was "made or published with intent to deceive" under § 523(a)(2)(B)(iv). As the Court noted in its discussion of Kapitus's first claim for relief, while the Court has no way of knowing for certain the debtor's state of mind, the circumstantial evidence is consistent with the debtor doing everything he could to keep the restaurant operations going during a difficult period. This includes providing Kapitus with whatever information it requested: including bank statements, tax returns, and other information about BJRP and affiliated companies. These records were like an open book into the restaurant's financial situation, identifying BJRP's other lenders as well as transfers back and forth among related entities. Thus, any false

26

statements respecting BJRP's financial condition were not "made or published with intent to deceive."

Accordingly, Kapitus has failed to prove by a preponderance of the evidence that the debt owed by the debtor to Kapitus is nondischargeable under § 523(a)(2)(B).

*Count Three—Nondischargeability under 11 U.S.C. § 523(a)(4)*

In Count Three, Kapitus alleges that the debt is nondischargeable under § 523(a)(4). Section 523 of the Bankruptcy Code provides, in pertinent part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual from any debt—
>> . . . .
>> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. . . .

11 U.S.C. § 523(a)(4). In its post-trial brief, Kapitus does not allege nondischargeability based on larceny; however, it does allege nondischargeability for fraud or defalcation while acting in a fiduciary capacity and for embezzlement.

The Sixth Circuit has defined defalcation as:

> A debt is nondischargeable as a defalcation when the preponderance of the evidence establishes: (1) a preexisting fiduciary relationship; (2) breach of that fiduciary relationship; and (3) a resulting loss.

27

*Bd. of Trs. of the Ohio Carpenters' Pension Fund v. Bucci* (*In re Bucci*), 493 F.3d 635, 639 (6th Cir. 2007) (citations omitted). "Fiduciary capacity," as applied in the defalcation provision of § 523, is construed more narrowly than the term is used in other contexts. The defalcation provision applies only to express or technical trusts, and "does not apply to someone who merely fails to meet an obligation under a common law fiduciary relationship. . . . Accordingly, the defalcation provision applies to only those situations involving an express or technical trust relationship arising from placement of a specific res in the hands of the debtor." *Id*. at 639–40 (citations omitted).

In addition, the Supreme Court recently addressed the state of mind requirement for defalcation under § 523(a)(4) of the Bankruptcy Code in *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013). In *Bullock*, the Supreme Court held that defalcation under § 523(a)(4) "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase . . . one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." 569 U.S. at 269.

Embezzlement is defined as the "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Brady v. McAllister* (*In re Brady*), 101 F.3d 1165, 1172–73 (6th Cir. 1996). "A creditor proves embezzlement by showing that he entrusted his property to the debtor, the debtor appropriated the property for a use other than that for which it was entrusted, and the circumstances indicate fraud." *Bucci* 493 F.3d at 644 (quoting *Brady*, 101 F.3d at 1173). The degree of fraud required for embezzlement is fraud in fact involving moral turpitude or intentional wrongdoing, for the purpose of permanently depriving another of his property. *Cash Am. Fin. Servs., Inc. v. Fox* (*In re Fox*), 370 B.R. 104, 116 (B.A.P. 6th Cir. 2007). Since a debtor is unlikely to admit to acting with bad motives, fraudulent intent may be shown through circumstantial evidence. *Id*. at 116. The court may be aided in its subjective analysis by the presence of traditional indicia of fraud—"e.g., suspicious timing of events, insolvency, transfers to family members or other insiders." *Automated Handling v. Knapik* (*In re Knapik*), 322 B.R. 311, 316 (Bankr. N.D. Ohio 2004). The Court should review the circumstances surrounding the case and determine "whether all the evidence

29

leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent." *Rembert*, 141 F.3d at 282.

In this case, Kapitus argues that because the debtor transferred funds from BJRP to its related ventures, the underlying debt should be nondischargeable under § 523(a)(4) for fraud or defalcation while acting in a fiduciary capacity and for embezzlement.

In *Bullock*, Justice Breyer discusses the heightened standard required under § 523(a)(4).

> Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent.

*Bullock*, 569 U.S. at 274. According to Justice Breyer, this reading is consistent with the constructs of statutory interpretation. By reading defalcation as a fiduciary as having a mental state that more approximates a criminal intent, defalcation as a fiduciary is not rendered superfluous. *Id.* Therefore, it is possible that a debtor's conduct may render an underlying debt nondischargeable for defalcation while acting as a fiduciary but not for fraud while acting as a fiduciary and vice versa. *See Bullock*, 569 U.S. at 275; *see also* 4 Collier on Bankruptcy ¶ 523.10[b] (16th ed. 2021).

30

Kapitus's argument under § 523(a)(4) relies upon the debtor's alleged commingling of funds and periodic transfer of funds between related entities. For the reasons that follow, Kapitus has failed to show by a preponderance of the evidence that the debtor acted with the requisite fraudulent intent for either fraud or defalcation while acting as a fiduciary or for embezzlement.

Section 2.12 of the Agreement states:

> **2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

*See* Pl. Ex. No. 7—Section 2.12. The parties disagree whether Section 2.12 barred BJRP from subsidizing related entities, or whether BJRP was merely limited to using the funds for legitimate business purposes. Before executing the argument, Kapitus received bank statements from BJRP which reveal that BJRP regularly transferred funds between related entities. *See* Pl. Ex. No. 23; *see also* Trial Tr. 128. With this knowledge, Kapitus still entered into the Agreement with BJRP which includes Section 2.12. However, even if the transfer of funds was outside the scope of the Agreement, Kapitus cannot show that the circumstances support that the

31

debtor acted with fraudulent intent. *See Rembert*, 141 F.3d at 282. First, regarding the suspiciousness of the transfer of funds from BJRP to related entities, Jonathan Gross testified that this was ordinary business practice and predated his employment with BJRP. *See* Trial Tr. 125–26. Second, while it is true that BJRP began experiencing cash flow problems in July of 2018, BJRP did return to making the full $7,418 weekly payment upon expiration of the modification agreement up until filing a Chapter 11 bankruptcy petition. Finally, the debtor personally guaranteed the debt that BJRP owed to Kapitus. Joint Stip. No. 29. The debtor's actions in this case are more indicative of an owner trying to keep his restaurant business afloat rather than a fraudulent scheme to benefit himself. Therefore, the evidence in this case does not show that it is more probable than not that the debtor acted with fraudulent intent.

Additionally, even though Kapitus has not met its burden of establishing the requisite mental state under either fraud or defalcation while acting as a fiduciary the Court will also briefly discuss fiduciary capacity. Section 523(a)(4) addressing fraud or defalcation while acting in a fiduciary capacity uses the same test for fiduciary capacity even though the requisite mental state may differ. Fraud or defalcation while acting in a fiduciary

32

capacity deals only with express or technical trusts and "does not apply to someone who merely fails to meet an obligation under a common law fiduciary relationship. . . ." *Bucci*, 493 F.3d at 639–40. In this case, it is unclear what would create such a fiduciary relationship within the meaning of § 523(a)(4). The only possible language that may create the requisite relationship is contained in the merchant agreement, which states that, "[m]erchant understands that it is responsible for ensuring that funds adequate to cover amount to be debited by FUNDER remains in the account." *See* Pl. Ex. No. 7. It is unclear whether this language creates a fiduciary relationship under either federal or state law that would satisfy § 523(a)(4). However, the Court need not decide whether a fiduciary relationship existed because Kapitus has failed to prove by a preponderance of the evidence the required mental state for either fraud or defalcation while acting as a fiduciary or for embezzlement.

Accordingly, Kapitus has failed to prove by a preponderance of the evidence that the debt owed by the debtor to Kapitus is nondischargeable under § 523(a)(4).

*Count Four—Nondischargeability under 11 U.S.C. § 523(a)(6)*

Section 523 of the Bankruptcy Code provides, in pertinent part:

33

> (a) A discharge under section 727. . . of this title does not discharge an individual from any debt—
>
> . . . .
>
>> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity. . . .

11 U.S.C. § 523(a)(6).  In order to except a debt from discharge under § 523(a)(6), the creditor has the burden of proving by a preponderance of the evidence that the debtor's conduct was willful and malicious.  *See Grogan*, 498 U.S. at 291.  The injury must be both willful and malicious.  *See In re Markowitz*, 190 F.3d 455, 463 (6th Cir. 1999); *In re Trantham*, 304 B.R. 298, 306 (B.A.P. 6th Cir. 2004).  A willful and malicious injury must be "a deliberate or intentional injury, not merely a deliberate or intentional act that leads to injury." *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998).

In *Kawaauhau*, the Supreme Court compared the "willful and malicious" standard of § 523(a)(6) to the legal standards for intentional torts, noting that "[i]ntentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.' " 523 U.S. at 62 (citing Restatement (Second) of Torts § 8A, comment *a*, p. 15 (1964)) (emphasis in original).  Thus, the Sixth Circuit has stated that "only acts done with the intent to cause injury—and not merely acts done intentionally—can cause willful and malicious injury."

34

*Markowitz*, 190 F.3d at 464. "Unless 'the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it' . . . he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Id.* (citing Restatement (Second) of Torts § 8A, comment *a*, p. 15 (1964)).

Kapitus alleges that BJRP's discontinuation of weekly ACH payments constitutes willful and malicious conduct by the debtor to divert proceeds of the funding and purchased receivables from Kapitus. As both parties stipulated, from May 21, 2018 through October 1, 2018, Kapitus deducted $7,418.00 weekly payments per the Agreement, except that during the period July 30, 2018 through August 20, 2018, the agreed weekly deductions were reduced to $3,000.00. *See* Pl. Ex. No. 10. The last payment made was in the amount of $7,418.00 on October 1, 2018, which was reversed on October 3, 2018, because BJRP filed a Chapter 11 bankruptcy case on September 28, 2018. *See In re BJRP, LLC*, Case No. 18-15839, Bankr. N.D. Ohio (Chapter 11 petition filed on September 28, 2018). Here, the payments stopped because BJRP filed a bankruptcy case, and there is no evidence that the debtor sought to divert funds from Kapitus for the purpose of causing harm. Because a willful and malicious injury must be "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads

35

to injury[,]" Kapitus has failed to reach its burden under § 523(a)(6). (*Kawaauhau*, 523 U.S. at 61 (emphasis in original)).

Accordingly, Kapitus has failed to prove by a preponderance of the evidence that the debt owed by the debtor to Kapitus is nondischargeable under § 523(a)(6).

CONCLUSION

For the reasons stated above, Kapitus has failed to establish by a preponderance of the evidence the elements for nondischargeability under any of its claims for relief. The Court therefore enters judgment in favor of the debtor.

IT IS SO ORDERED.

36